Ryan B. Abbott (SBN 281641)
ryan@bnsklaw.com
**BROWN NERI SMITH & KHAN LLP**
11601 Wilshire Boulevard, Suite 2080
Los Angeles, California 90025
Telephone: (310) 593-9890
Facsimile: (310) 593-9980

*Attorneys for Plaintiff Suryast U.S. Enterprises, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SURYAST U.S. ENTERPRISES, LLC, a California limited liability company, <br><br> *Plaintiff*, <br><br> v. <br><br> SHIRA PERLMUTTER, in her official capacity as Register of Copyrights and Director of the United States Copyright Office; and THE UNITED STATES COPYRIGHT OFFICE, <br><br> *Defendants*. | Case No.: 2:26-cv-4999 <br><br> **COMPLAINT** |

Plaintiff Suryast U.S. Enterprises, LLC ("Suryast LLC") files this Complaint ("Complaint") against Defendants Shira Perlmutter, in her official capacity as Register of Copyrights and Director of the United States Copyright Office ("Register") and the United States Copyright Office ("Copyright Office") (collectively, "Defendants"), and shows as follows:

1

COMPLAINT

## NATURE OF SUIT

1.     Ankit Sahni ("Author") created the original, two-dimensional artwork reproduced below ("Work"):



2.     The Author created this artwork by taking an original photograph of a sunset over a building and then using an artificial intelligence application, the RAGHAV Artificial Painting App ("RAGHAV"), to convert his photograph into the Work.

3.     The Author filed to register the Work with the Copyright Office, naming himself as its author and acknowledging that he had used RAGHAV as an assistive software tool.

4.     In a final agency action, the Copyright Office, denied registration, deciding that the Work is a derivative work and that the "Work is not the product of human authorship."

5.     This denial is based on the Copyright Office's Human Authorship Requirement, which creates, in effect, a *per se* rule against registration of works or portions of works created using AI tools. The Human Authorship Requirement is contrary to the text, history, and purpose of the Copyright Act and contrary to the Constitutional mandate to promote the progress of science.

6.     The Author then assigned the copyright in the Work to Suryast LLC.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 5 U.S.C. §§ 701–06; 28 U.S.C. §§ 1331, 1338, 1361, 2201–02, because the matter arises under the Copyright Clause of the United States Constitution, the federal Copyright Act, seeks review of a final agency action of the Copyright

COMPLAINT

Office, and seeks injunctive and declaratory relief against a federal agency and a federal government official in their official capacity.

8.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because the plaintiff resides in this District.

## PARTIES

9.    Plaintiff Suryast LLC is a limited liability company organized under the laws of California with its principal place of business in California.

10.    Defendant Shira Perlmutter is named in her official capacity as the Register of Copyrights and Director of the United States Copyright Office. Under 17 U.S.C. § 701, the powers and duties of the Copyright Office are vested in the Register.

11.    Defendant United States Copyright Office is a department of the Library of Congress, responsible for registering copyright claims and maintaining records of copyright ownership.

## FACTUAL BACKGROUND[1]

**A.    The Author Creates the Work**

12.    The Author initially took the following photograph of a sunset over a building ("Base Photo"):



---

[1] The factual allegations are supported by the record before the Copyright Office, which the Copyright Office did not dispute.

3

COMPLAINT

13. The Author then used RAGHAV to edit the Base Photo. RAGHAV is an artificial intelligence software that can modify inputted works by applying certain styles or filters based on instructions from the user.

14. The Author used RAGHAV to modify the Base Photo in the style of Vincent van Gogh's Starry Night, which resulted in the creation of the Work depicted above.

**B.      The Copyright Office Repeatedly Rejects Registration of the Work**

15. On March 1, 2022, The Author submitted the Work to the Copyright Office for registration ("Initial Application").

16. On June 29, 2022, the Copyright Office issued a refusal to register the Work ("First Refusal"). The First Refusal stated that the Work "lacks the human authorship necessary to support a copyright claim" and because the Work "was in part generated by a computer program, [the Copyright Office is] unable to register [the] claim."

17. On September 27, 2022, the Author submitted the Request for First Reconsideration ("First Reconsideration Request"). He detailed the process of creating the Work, including taking the Base Photo and the use of RAGHAV, explained his specific creative input into this process, and cited the legal authority for the registration.

18. On April 10, 2023, the Copyright Office issued another refusal to register the Work ("Second Refusal"). The Second Refusal stated that the Work is a "derivative work" and that it did "not exhibit the requisite human creativity needed to support a claim to copyright in a derivative work."

19. On July 10, 2023, the Author submitted the Second Request for Reconsideration ("Second Reconsideration Request"). He again showed how the Work contained traditional elements of human authorship and the various elements of creative control he exercised in creation of the Work.

20. On December 11, 2023, the Copyright Office issued its final refusal to register the Work ("Final Refusal"). The Final Refusal cited the Copyright Office's Human Authorship Requirement and its published guidance regarding works containing AI-generated material. It reaffirmed that the Copyright Office considered the Work to be a "derivative work" and "the Work is

4

COMPLAINT

not the product of human authorship" because "the expressive elements of pictorial authorship were not provided by Mr. Sahni. … The fact that the Work contains sunset, clouds, and a building are the result of using an AI tool that generates an image with the same content as a base image, but with the style of a chosen picture."

21.     On April 21, 2026, the Author assigned the copyright and all associated rights in the Work to Suryast LLC.

**FIRST CAUSE OF ACTION**
**Violation of the Administrative Procedure Act**
**(Against All Defendants)**

22.     Suryast LLC incorporates by reference all the allegations of the foregoing paragraphs, as though fully set forth herein.

23.     The Copyright Office's Final Refusal constituted a final agency action, and Suryast LLC seeks to reverse the Final Refusal here.

24.     The Author exercised creative control and input into the work by selecting himself taking the Base Photo, which established the baseline creative elements of the work, including that it would have buildings, a sunset, a large portion of the sky, and the relative location of each of these features. He then selected a specific style, the style of Van Gogh in The Starry Night, which is characterized by a specific color palette, broad brush strokes, curved lines, and other features, and used RAGHAV to modify the Base Photo to retain the baseline elements but add these additional creative features.

25.     Nonetheless, the Copyright Office denied registration for the work based on its Human Authorship Requirement and AI guidance, which specifies that an applicant must disclaim registration for any portion of work that is generated by AI, without taking into consideration the extent of the author's creative control of the AI tool or creative input into those portions of the work that is affected by the AI tool. In effect, the Copyright Office's AI policy amounts to a *per se* denial of registration to any work or portion of work that is created using AI tools.

COMPLAINT

26. The Copyright Office's refusal to register the Work is not supported by the Copyright Act or other federal law. It is therefore, arbitrary, capricious, an abuse of discretion and not in accordance with the law.

27. The Court should set aside the Copyright Office's refusal to register the Work and order the Copyright Office to register the Work.

## PRAYER FOR RELIEF

WHEREFORE, Suryast LLC respectfully requests that this Court grant judgment in its favor and against Defendants as follows:

1. Set aside the Copyright Office's refusal to register the Work;

2. Order the Copyright Office to register the Work in its entirety with Sahni as the author;

3. Award costs and reasonable attorney's fees to Sahni; and

4. Order any other and further relief, at law or in equity, which the Court determines is appropriate.

Dated: May 8, 2026                          **BROWN, NERI, SMITH & KHAN LLP**

By: */s/ Ryan Abbott*
    Ryan Abbott, Esq.
    11601 Wilshire Blvd, Ste. 2080
    Los Angeles, CA 90025
    Phone: (310) 593-9890
    Fax: (310) 593-9980
    Ryan@bnsklaw.com

    *Attorneys for Plaintiff Suryast U.S.*
    *Enterprises, LLC*

6

COMPLAINT

# EXHIBIT 1

Case 2:26-cv-04999     Document 1     Filed 05/08/26     Page 8 of 64     Page ID #:8

 **Gmail**

<div align="right">Ankit Sahni &lt;ankitsahni13@gmail.com&gt;</div>

## U.S. Copyright Office Correspondence: 1-11016599571 SURYAST

**Copyright Office** &lt;cop-ad@loc.gov&gt;	Tue, Mar 1, 2022 at 1:51 AM
To: ankitsahni13@gmail.com

Dear Ankit Sahni:

Please respond to the questions below within 45 days and include the [THREAD ID], using the brackets, as part of your response. The [THREAD ID] is located below the Examiner's signature block. The [THREAD ID] must be in the body of your response, NOT the subject line. If you put the [THREAD ID] in the subject line, we will not get your message.

We are writing to clarify information provided on your application for copyright registration. Your application lists Ankit Sahni as the author of "photograph, 2-D artwork," and RAGHAV Artificial Intelligence Painting App as the author of "2-D artwork." To qualify as an original work of authorship and be protected by copyright, a work must be created by a human being.

Based on your claim in "photograph," we assume that some part of the image is derived from a photograph. Explain the step-by-step processing used to derive the final work from any photos used. Walk us through from your starting point to the end result.

Next, we recognize that you used an AI computer code or program. Please explain what the program allowed you to do, and how you manipulated and interacted with the program to render the final work. Our experience with AI code of this sort is that the code measures and copies from a real-life image, and then renders the likeness into a digital form or representation. Our further experience is that the person in your position, Mr. Sahni, operates the machinery hardware and computer software according to strict procedures and instructions. However, you are making copying decisions, not creative artistic decisions. The process might be time-consuming, highly professional, and require much skill and care, but the operator is a tool for helping the machine and software copy a likeness. Highly skilled and capable persons of this sort are copyists and craftsmen, not creative artists of the kind that copyright considers an author.

If you do not think that your situation fits this nearly unexceptional mold, you must provide us with a detailed response that clearly explains how you were in this case an author and not merely a craftsman who manipulated an AI-based process to copy. As a rule of U.S. Copyright Law, copyists are not authors and thus cannot claim copyright protection, even if the copying process was very highly skilled and AI-based. Copyright protects original works of authorship where "originality" as used in the copyright context means that the work was independently created by the author (as opposed to copied from other works). See Feist Publications v. Rural Telephone Service Co., 499 U.S. 345 (1991); also Burrow-Giles Lithographic Co. v. Sarony (1884). Further, when examining a work for original authorship, the Copyright Office will not consider the amount of time, effort, or expense required to create the work. Compendium 310.7. These elements have no bearing on whether a work possesses the minimum amount of creativity required by the Copyright Act and United States Constitution. Feist Publications v. Rural Telephone Service Co., 499 U.S. 340, 352-354, 364 (1991).

To qualify as an original work of authorship and be protected by U.S. Copyright Law, a work must contain original and creative authorship that can be credited to a human being. In your response, please describe, in detail, the creative authorship contributed by you, Ankit Sahni. Also, please clarify what the RAGHAV Artificial Intelligence Painting App is responsible for and why it has been named as a co-author on the application. Further details explaining the materials, processes, and/or techniques that were used in the creation of the work will assist us in our examination of the claim.

Once I receive your reply to this email, I will assist you further if necessary.

Sincerely,
Examiner CLH
Visual Arts Division
Office of Registration Policy & Practice
U.S. Copyright Office

IMPORTANT NOTE: The THREAD ID appearing at the end of this message MUST be included within the body of your response in order for your message to be properly routed. When replying to this message, make sure to copy the whole THREAD ID, including brackets, and paste it into the body of your response, preferably after the greeting. DO NOT include the THREAD ID in the subject line of your reply. If you put the THREAD ID in the subject line, we will not get your message.

Failure to comply exactly with our instructions will result in your email not being connected to your application, and your case will be closed without further correspondence from us.

When replying to this email, please include the following thread id (entire line) within the body of your response to expedite routing to the correct office.

[THREAD ID:1-55FC7US]

# EXHIBIT 2

Dated: April 14, 2022

Dear Madam/Sir,

[THREAD ID:1-55FC7US]

I am deeply appreciative and grateful for the time that you may have spent on thinking through the circumstances of this peculiar copyright application, and for your detailed and precise feedback. Please find my response to your questions below, for your kind consideration:

**Part 1: RAGHAV Artificial Intelligence Painting App: Background, underlying technology and operational mechanism**

1.1 **Biological parallel between Neural Networks and brain**

One of the main differences between Machine Learning and other computer algorithms is that Machine Learning learns a vast set of rules based on the data fed into it. On the other hand, other algorithms have to rely on the programmer to type in a set of predefined rules.

The machine learning algorithm behind RAGHAV is based on the Machine Learning subfield called Neural Networks.



**Figure 1.1** Essential components of a neuron shown in stylized form.

**Figure 1.2** Simple artificial neuron.

*Figure 1: Biological and Artificial Neurons [ref]*

Neural Networks are programmed structures inspired from biological neurons of the nervous system. A biological neuron (Figure 1, Left) takes several incoming signals through synapses, electrochemical junctions located on dendrites, branches of the neuron cell. The cell body processes all the signals and generates a resulting signal based on a threshold which gets transmitted to other neurons through the axon. Similarly, an Artificial Neuron (Figure 1, Right) takes values as inputs from multiple artificial neurons, processes them using matrix multiplications (using values called weights) and other operations, and outputs the resulting signals to other artificial neurons.

### 1.2. **Neuron, layer, CNNs, feature extraction**



A 3-layer neural network with three inputs, two hidden layers of
4 neurons each and one output layer.

*Figure 2: Neural Network [ref]*

Many artificial neurons form a layer, and many layers form a Neural Network (Figure 2). An input layer can be pixel values of an image, numerical representations of words in a text, descriptive values in tabular data etc. The output layer can be a label predicting a category like 'dog' in an image, 'price' of a house given descriptive feature values of the house, next word prediction given a sequence of words, etc. The hidden layers are latent representations which form learnt intermediate features required to predict the output from given input. With each pair of input and output training data provided to the neural network, it updates its weights in the layers such that the output can be generated for the given input. When it learns using all data in the entire training set, we hope for the neural network to have generalized, that is learnt enough representations to produce a correct output for any new unseen input.



*Figure 3: Convolutional Neural Network [ref]*

A Convolutional Neural Network (Figure 3) (CNN) is a neural network with efficient operations in its layers for learning features from input images. It learns basic features like edge detection in its initial layers, then using these simple features, learns more complex features like textures and patterns in subsequent layers, and then using those learns features of complex objects like dog noses, human eyes and flowers in later layers of the network. (Figure 4)



*Figure 4: Features which layers learn in a CNN [ref]*

*Figure 5: Feature representation space (projected to 2D space) learnt by a CNN [ref]*

A CNN can learn a multi-dimensional representation space where similar images are closer together. If we pass input images to the CNN, and extract the representational vectors from its penultimate layer, then vectors from similar images (or images belonging the same category) will cluster together. (Figure 5)

### 1.3 Neural artistic style transfer

**RAGHAV** is based on a technique called **Neural Style Transfer** which is built using **CNNs**. Neural Style Transfer is a technique that allows us to generate an image with the same "content" as a base image, but with the "style" of our chosen picture.

Specifically, RAGHAV is built with a variant of Neural Style Transfer using the research paper "Exploring the structure of a real-time, arbitrary neural artistic stylization network" [ref]. A  CNN is used to extract the features for the content and style images. (Figure 6).



*Figure 6: Architecture for Neural Style Transfer [ref].*

It is based on the following definitions:

1. Two images are similar in content if their high-level features as extracted by an image recognition system are close in Euclidean distance.

2. Two images are similar in style if their low-level features as extracted by an image recognition system share the same spatial statistics. This is motivated by the hypothesis that a painting style may be regarded as a visual texture. Literature suggests that repeated motifs representative of a visual texture may be characterized by lower order spatial statistics. Images with identical lower-order spatial statistics appear perceptually identical and capture a visual texture.

Here, the image recognition system refers to a CNN, trained with image recognition task on a large corpus of 14M images called ImageNet. It is then trained for the task of Neural Style Transfer with training content and style images. After training, any new unseen image can be used as a style image. (Figure 7)



Figure 1: Stylizations produced by our network trained on a large corpus of paintings and textures. The left-most column shows four content images. Left: Stylizations from paintings in training set on paintings (4 left columns) and textures (4 right columns). Right: Stylizations from paintings never previously observed by our network.

*Figure 7: New unseen styles can be used for Neural Style Transfer [ref]*

1.4 **Creative Aspects of the specific Neural Style Transfer algorithm**

A variable value determining the amount of style transfer between content and style can also be specified which leads to different outputs for different values. (Figure 8)



Figure 8: Linear interpolation between identity transformation and unobserved painting. Note that the identity transformation is performed by feeding in the content image as the style image.

*Figure 8: Amount of Content and Style Transfer can be controlled*

Using multiple styles is also possible for a single content image by extracting and using the features from all of the style images.

The embedding representation space learnt by the CNN captures semantic structure of styles, that is, semantically similar styles would be clustered together.

The structure of the embedding representation space learnt by the CNN also permits novel exploration. The CNN model can capture a local manifold from an individual artist or painting style (Figure 9). The embedding space can be explored and new stylizations can be generated by varying local style changes for a specific painting style. Thus, new styles can be used (either entirely different or a variation of a given style image) for a different output each time for the same content image.

Figure 7: Exploring the artistic range of an artist using the embedding representation. Calculated two-dimensional principal components for a given artist and plotted paintings from artist in this space. The principal component space is graphically depicted by the artistic stylizations rendered on a photograph of the Golden Gate Bridge. The center rendering is the mean and each axis spans ±4 standard deviations in along each axis. Each axis tick mark indicates 2 standard deviations. Left: Paintings and principal components of Janos Mattis-Teutsch (1884-1960). Right: Paintings and principal components of Fernand Leger (1881-1955). Please zoom in on electronic version for details.

*Figure 9: New styles based on an artist's artistic range can be used on the fly*

**Part 2: SURYAST: Step-by-step walkthrough**

2.1 In the context of the abovementioned description of how RAGHAV works, the following is a step-by-step walkthrough of how the subject artwork 'SURYAST' was created using RAGHAV.

2.2  As explained above, RAGHAV accepts two inputs from the user. One input image is the style input, and the other is the content input. For the content input, I used an original photograph clicked by me using my phone's camera. The photograph is provided below for reference. As the author thereof, I am the sole owner of all rights (including copyright) in the photograph.



*Figure 10: Photograph clicked and owned by Ankit Sahni; provided as the content input to RAGHAV*

2.3 For the style input, I selected Vincent van Gogh's *The Starry Night*. The said painting was created in 1889. The original painting is currently on display at the Museum of

Modern Art, New York City. Notably, the artist Vincent van Gogh died in 1890, and therefore as of the date of creation of SURYAST, the copyright in the said painting titled *The Starry Night* had lapsed and the painting had become *publici juris*.



*Figure 11: The Starry Night by Vincent van Gogh; used by Ankit Sahni as the style input to RAGHAV*

2.4 Thereafter, I exercised my discretion to select a variable value determining the amount of style transfer between content and style images on RAGHAV Artificial Intelligence Painting Application (as illustrated under paragraph 1.4 above). The acts of selecting a specific variable value determining the amount and manner of style transfer

between content and style images, selection of the style image (keeping into consideration the particular patterns and brushstrokes that the style image contains, the ability of RAGHAV to learn them, and the similarity of features such as the sky, buildings etc. in both content and style images), conceiving, creating and selecting an original content image (whose copyright belongs to me – Figure 10) cumulatively resulted in the output (below), which is the direct outcome of my creative expression and contribution. The selection of the specific variable value, the style input and the content input are completely arbitrary decisions, and are a culmination of my independent artistic expression and discretion. This outlines my independent, original and creative authorship in the subject artwork.



*Figure 12: SURYAST (Hindi word for sunset); generated with the assistance of RAGHAV*

2.5 Therefore, it is submitted that my role goes beyond that of a mere craftsman or the operator of a tool. In fact, relying on the facts and the *ratio decidendi* of the US Supreme Court judgment in Burrow-Giles Lithographic Co. V. Sarony, I'd like to argue that the contribution made by me as aforementioned goes above and beyond that of a photographer simpliciter, whose contribution was considered worthy enough for him to claim authorship (and for his output to be protected under copyright law). Thus, I believe I am entitled to be recognised as an author of the subject artwork titled SURYAST.

2.6 Further, I'd like to place reliance on Feist Publications vs. Rural Telephone Service Co. 499 U.S. 345 (1991). Paragraph 53 of the judgment states as follows: "*…As mentioned, originality is not a stringent standard; it does not require that facts be presented in an innovative or surprising way. It is equally true, however, that the selection and arrangement of facts cannot be so mechanical or routine as to require no creativity whatsoever. The standard of originality is low, but it does exist.*" Paragraph 44 provides: "*…As discussed earlier, however, the originality requirement is not particularly stringent. A compiler may settle upon a selection or arrangement that others have used; novelty is not required. Originality requires only that the author make the selection or arrangement independently (i.e., without copying that selection or arrangement from another work), and that it display some minimal level of creativity.*" (emphasis supplied). The inputs provided by me in order to arrive at the final outcome which is the artwork titled 'SURYAST', as described in the above mentioned paragraphs, go beyond the minimum threshold of creativity as prescribed under law and as recognised by the Supreme Court.

My contribution to the subject artwork is independent, original and creative. Further, the photograph which formed part of the content input provided by me to RAGHAV is my original work, in which I own all rights including copyright. Therefore, the work titled SURYAST is entitled to be protected under copyright law and I am entitled to claim authorship of the same.

**Part 3: Authorship of RAGHAV Artificial Intelligence Painting App**

3.1 RAGHAV, using the input datasets provided by me, following the process detailed under Part of 1 of my response, created and rendered the subject artwork titled 'SURYAST'. RAGHAV's contribution is distinct, disparate and independent from my contribution in the subject artwork. The final artwork titled 'SURYAST' generated by RAGHAV is a consequence of its unique capabilities to render original artistic works as described above.

3.2 Further, it is an obligation cast by the law on me (as the applicant) to disclose all facts and circumstances pertaining to the application accurately and honestly, without suppressing anything. In case I were to fail in discharging such obligation, the present application, if registered, would be liable to be invalidated under the provisions of Title 17 U.S. Code §411. Therefore, in view of my *bona fide* belief and understanding as summarised in the above mentioned paragraphs, RAGHAV has been named as a co-author in the present application.

3.3 In support of the above submissions, I'd also like to place reliance on COMPENDIUM (THIRD) § 306 which provides as follows: "*…. Because copyright law is limited to "original intellectual conceptions of the author, the Office will refuse to register a claim if it determines that a human being did not create the work…*" and COMPENDIUM (THIRD) § 313.2 which provides: "*…To qualify as a work of "authorship" a work must be created by a human being…. the Office will not register works produced by a machine or mere mechanical process that operates randomly or automatically without any creative input or intervention from a human author. The crucial question is "whether the 'work' is basically one of human authorship, with the computer [or other device] merely being an assisting instrument, or whether the traditional elements of authorship in the work (literary, artistic, or musical expression or elements of selection, arrangement, etc.) were actually conceived and executed not by man but by a machine.*" It is submitted that the present application falls outside the ambit of the abovementioned exclusions since the subject artwork has been created by a human being where the work is basically one of human authorship and the computer (RAGHAV AI) is an assisting instrument. Specifically, this case is distinguishable from a case where an AI is claimed to be the sole author. In the present matter, the subject artwork has not been produced by a machine or mere mechanical process that operates randomly or automatically without any creative input or intervention from a human author. Traditional elements of authorship in the work (including elements of selection, arrangement etc.) were substantially conceived and executed by a human author. Therefore, it is submitted and prayed that the subject artwork deserves to be protected and thus, may be registered by the Copyright Office.

3.4 Without prejudice to the above mentioned submissions, it is prayed that in the alternative, the Copyright Office may consider registering the subject artwork with the human being as the sole author along with due attribution in the Copyright records (as well as in the certificate) to the fact that it was created with the assistance of a computer (being RAGHAV Artificial Intelligence Painting Application).

It is requested that in case the aforementioned submissions are not acceptable and the Copyright Office proposes to pass an adverse order, I may kindly be heard in person or over a video conference and a date for such hearing may please be notified.

Additionally, I'd like to bring to your kind attention that I will be visiting Washington DC from April 29, 2022 till May 10, 2022. I will be grateful if you could allow me to present my submissions in person at the Copyright Office on any of the said dates.

I thank you once again for the opportunity to present my views, and remain at your disposal for any further assistance that I may have the privilege of lending to the examination of this application.

Yours truly,

(ANKIT SAHNI)

31/42 Punjabi Bagh West,
New Delhi 110026,
India

ankitsahni13@gmail.com

+91-9999898890

# EXHIBIT 3



**United States Copyright Office**

Library of Congress · 101 Independence Avenue SE · Washington DC 20559-6000 · www.copyright.gov

June 29, 2022

Ankit Sahni
31/42 Punjabi Bagh West
New Delhi,  110026
India

Correspondence ID:    1-59RZRGS

RE:      SURYAST

Dear Ankit Sahni:

We cannot register this work because it lacks the human authorship necessary to support a copyright claim.  In correspondence you state that the RAGHAV Artificial Intelligence Painting App "created and rendered the subject artwork titled 'SURYAST'. RAGHAV's contribution is distinct, disparate and independent from my contribution in the subject artwork." Because you state this work was in part generated by a computer program, we are unable to register your claim. A work must be created by a human being in order to be registered with the *U.S. Copyright Office, Compendium (Third) § 313.2.* Even though you argue that there is some human creative input present in the work that is distinct from RAGHAV's contribution, this human authorship cannot be distinguished or separated from the final work produced by the computer program.

Copyright protects original works of human authorship that are fixed in some physical form.  See *17 U.S.C. § 102(a).*  As used in the copyright context, the term "original" means that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least a minimal degree of creativity.  See *Feist Publications v. Rural Telephone Service Co., 499 U.S. 340 (1991).*

The U.S. Copyright Office will register an original work of authorship only if the work was created by a human being. The copyright law only protects "the fruits of intellectual labor" that "are founded in the creative powers of the mind." *Trade-Mark Cases, 100 U.S. 82, 94 (1879).* Because copyright law is limited to "original intellectual conceptions of the author," the Office will refuse to register a claim if it determines that a human being did not create the work. *Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53, 58 (1884). See also 17 U.S.C. §102(a) & U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 306 (3d ed. 2021).*

Neither the aesthetic appeal or commercial value of a work, nor the amount of time and effort expended to create a work are factors that are considered under the copyright law.  See *Bleistein v. Donaldson, 188 U.S. 239 (1903); Feist Publications v. Rural Telephone Service Co., 499 U.S. 340 (1991).*  The question is whether there is sufficient creative human authorship within the meaning of the copyright statute and settled case law.

Ankit Sahni                                    - 2 -                                    1-59RZRGS

After careful consideration, we have determined that this particular work will not support a claim to copyright under the standards described above.  Therefore, we cannot issue the registration which you requested.  The copyright law requires that we retain the deposit of this work.  See *17 U.S.C. § 704(a).* The nonrefundable filing fee has been applied to administrative costs.

Sincerely,
Examiner CLH
Visual Arts Division
Office of Registration Policy & Practice
U.S. Copyright Office

Enclosures:
  Reply Sheet



**United States Copyright Office**

Library of Congress · 101 Independence Avenue SE · Washington DC 20559-6000 · www.copyright.gov

||||||| ||||| ||||| |||| ||||| ||| ||||| |||
**\*1-59RZRGS\***

# Use this sheet <u>if</u> you request reconsideration

## How to request reconsideration:

- Send your written explanation *of why the claim should be registered or why it was* improperly refused.
- Be sure to include the Correspondence ID Number (listed under the bar code above) on the first page of your Request.
- Indicate whether you are requesting a "First Reconsideration" or "Second Reconsideration."
- **Submit your request ONLINE:** We strongly recommend sending all requests for reconsideration via email following these steps:

   **EMAIL YOUR REQUEST (BUT NOT THE REQUIRED FEE) to:**
   reconsideration@copyright.gov.
   o  The subject line should say "First Reconsideration" or "Second Reconsideration"
   o  Once your email request is received, you will be contacted with instructions on how to submit the required fee.
   o  Failure to send your request for reconsideration to the above email address will result in a delayed response.

   **IMPORTANT NOTE**: Your request and the required fee must be received no later than three months after a refusal is issued.

- **Alternatively, you may submit your request VIA MAIL**:

   o  **IMPORTANT NOTE**: Your request must be postmarked (via the U.S. Postal Service) or dispatched (via commercial carrier, courier, or messenger) no later than three months after a refusal is issued.
   o  Enclose the required fee.
   o  Address your request to**:**

      **FIRST RECONSIDERATION *or* SECOND RECONSIDERATION**
      **U.S. Copyright Office**
      **MCA Division**
      **P.O. Box 71380**
      **Washington, DC 20024-1380**

Ankit Sahni                                        - 4 -                                            1-59RZRGS

**First Request for Reconsideration ($350.00 per application):** The Registration Program Office considers the first request. If it upholds the refusal, you may submit a second request.

**Second Request for Reconsideration ($700.00 per application):** The Copyright Office Review Board considers the second request. The Board consists of the Register of Copyrights and the General Counsel (or their respective designees), and a third member appointed by the Register. The Board's decision constitutes final agency action.

**Notification of decision**: The Copyright Office will send all notifications of its decisions by email to the email address provided in the record and/or in the request for reconsideration. If no email address is provided, the Office will send its decision via mail.

**RECONSIDERATION FEES:**

**First Request**        $350 per application

**Second Request**        $700 per application

READ MORE:

- U.S. Copyright Office Administrative Appeals:
  https://copyright.gov/comp3/chap1700/ch1700-administrative-appeals.pdf

- U.S. Copyright Office Fees:
  https://copyright.gov/circs/circ04.pdf

- Copyright Basics:
  https://copyright.gov/circs/circ01.pdf

- Copyright Registration:
  https://copyright.gov/circs/circ02.pdf

# EXHIBIT 4

## DAY PITNEY LLP

BOSTON    CONNECTICUT    FLORIDA    NEW JERSEY    NEW YORK    PROVIDENCE    WASHINGTON, DC

**ALEX P. GARENS**

**SEAN PARK**

One Federal Street, 29th Floor
Boston, MA 02110
T: (617) 345-4872 F: (339) 600-9982
agarens@daypitney.com
wpark@daypitney.com

September 27, 2022

**Via Email to (reconsideration@copyright.gov)**

United States Copyright Office
Library of Congress
101 Independence Avenue SE
Washington DC 20559-6000

CORRESPONDENCE ID: 1-59RZRGS

RE: SURYAST - Request for First Reconsideration

Dear Examiner of the United States Copyright Office,

We file this Request for First Reconsideration in response to the Refusal issued on June 29, 2022, by Examiner CLH, refusing registration of the work SURYAST (the "Work") on the basis that it lacked human authorship due to the contribution by an AI powered tool in the creation process. We recognize the human authorship requirement and are not challenging whether a work created entirely by a non-human is eligible for copyright protection. However, the human authorship requirement does not and cannot mean a work must be created entirely by a human author. The involvement of some degree of AI-contribution to a work does not and cannot render the entire work unprotectable. Rather, if a work, such as the Work SURYAST, is the result of the creative and artistic choices and expressions of the human author, the work must be deemed an original work of human authorship.

As a preliminary matter, we request to amend the application to list only Ankit Sahni ("Sahni") as the author of "photograph, 2-D artwork," and to remove RAGHAV Artificial Intelligence as author of the "2-D artwork."

I.      Background

As summarized in our submission of March 1, 2022, the Work was created by the human author Sahni with the partial assistance of the AI-powered assistive tool RAGHAV (the

112693363.6



September 27, 2022
Page 2

"RAGHAV tool"). In the simplest possible terms, Sahni took an original photograph and then selected and applied a computer-software "filter" to that original photograph, changing the visual "style" of his photograph to create a 2-D artwork. Below are the original photograph (left) and the final Work (right).

 

More specifically, Sahni selected and uploaded the original photograph into the RAGHAV tool and then he selected various inputs, parameters, and controls to apply to the original photograph. Sahni selected the input style "Van Gogh" (a broad brush-stroke painting style) to filter his original photograph through. Sahni also selected the "strength" of the filter, meaning, how heavily the assistive tool would apply the filter to the original photograph. The resulting work, SURYAST, is therefore, at its core, an original photograph that has been digitally altered by assistive software tools. Such works are regularly registered. The fact that this assistive software happens to have an AI-powered component does not change that legal determination that the Work is registrable.

Indeed, in viewing the Work SURYAST, the degree of Sahni's human authorship is substantial and clear. Aside from the "filter" of the Van Gogh style applied, the Work displays the original photograph's structure, angle, and lighting that are all copyrightable subject matter. Moreover, the decision to apply the particular filter at the specified level was all made by the human author, while the RAGHAV AI simply carried out the command. Indeed, Sahni's use of

112693363.6



September 27, 2022
Page 3

the RAGHAV tool itself was in itself another artistic human contribution, as it served as an assistive tool to achieving his artistic goals. Accordingly, the mere fact that the assistive tool was AI powered does not override and undo the undeniable, significant, and sufficient human authorship of Sahni.

II.    Legal and Regulatory Authority

The Copyright Act protects "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."  17 U.S.C. §102(a).  There is no statutory requirement for exclusive human authorship, and the section expressly contemplates potential "aid of a machine or device."  Indeed, "author" and "authorship" are not defined in anyway.  Moreover, Section 201(b) expressly states "the employer or other person for whom the work was prepared is considered the **author** for the purposes of this title."  The Office has recognized numerous humans and non-humans to be "authors for the purpose of [Title 17 of the U.S. Code.]"  Such recognition of a non-human author is distinct from other statutes, as, for example, 35 U.S.C. §100(f) explicitly defines "inventor" to mean "**individual** . . . who invented or discovered the subject matter of the invention."  Accordingly, the Office's requirement of an exclusive human authorship is not rooted in the statutory language.  Indeed, the Compendium of U.S. Copyright Office Practices provides,

> the Office will not register works produced by a machine or mere mechanical process that operates randomly or automatically without any creative input or intervention from a human author. The crucial question is "whether the 'work' is basically one of human authorship, with the computer [or other device] merely being an *assisting instrument*, or whether the traditional elements of authorship in the work . . . were actually conceived and executed not by man but by a machine."

Compendium of the U.S. Copyright Office Practices, Third Edition ("Compendium (Third)"), Section 313.2 (emphasis added).  Therefore, a work of a human authorship with assistance from an artificial intelligence or another tool is protectable under the Copyright Act.

III.    Argument

The Work contains more than sufficient level of the minimal degree of human creativity required under *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340 (1991).  Compendium states the copyright law only protects "the fruits of intellectual labor" that "are founded in the creative powers of the mind."  Compendium (Third) Section 306 (citing *Trade-Mark Cases*, 100 U.S. 82, 94 (1879).)  Section 313.2 additionally states, "the Office will not

112693363.6



September 27, 2022
Page 4

register works produced by a machine or mere mechanical process that operates randomly or automatically without any creative input or intervention from a human author." This language does not describe how the Work was created here, as the human author provided the necessary creative input.

The case law, the Compendium, and the Copyright Review Board's February 14, 2022 refusal to register "A Recent Entrance to Paradise" all recognize that the human authorship requirement need not be absolute. Indeed, one can imagine countless scenarios in which a human author creates a work and then "applies" some non-human treatment to it, selected and controlled by the human, for artistic effect. Take for example, a painting of a beach that the author then lies on the ground and arranges for a duck to walk across with black paint on its feet (the author selecting the color paint and how many times the duck walks across it); a musical sound recording intentionally made with background rain and thunder noises (the author selecting the presence and degree of the background noises); or a wooden sculpture of a tree that is stained white and then left outside near a forest fire, exposing it to ash clouds and smoke (the author selecting the location and duration of exposure). These are literal and extreme examples of utilizing a non-human assistive tool in the creative process, but the use of technology as a non-human assistive tool is commonplace, from autofocusing software embedded in cameras, to photo enhancing and corrective filters that detect and automatically adjust visual settings such as contrast, brightness, saturation, sharpness, and hue, to magic erasure tools (such as Adobe Sensei) that can entirely remove objects from photos and videos, seamlessly recreating the background behind it. Indeed many of these technology tools are built on some form of AI or machine learning, and fewer and fewer works are created with only human efforts. Accordingly, limiting the availability of copyright registration to exclusively human created works would not only be a break from how the Copyright Office has historically addressed such category of works, but would severely impede creativity and progress of arts, in contravention of the Copyright Act and Constitution. As technology continues to shape and enhance the human artistic process, works created with an AI-powered assistive tool cannot be left behind. In each of the above hypothetical cases the resulting work is still clearly a work of human authorship, even though there was a non-human component used as an assistive tool. The Work here is the same.

As stated in the March 1, 2022 letter to the Office, the Work was created with two input from the human author, one regarding the content and the other regarding style. The first input for content is a photograph of a sunset created by the human author. The Supreme Court in *Burrow-Giles Lithographic Co. v. Sarony* noted that the Founding Fathers used the term "author" in the Constitution as "he to whom anything owes its origin; originator; maker; one who completes a work of science or literature" and would include those forms "by which the ideas in the mind of the author are given visible expression." *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58 (1884). Accordingly, the content input itself is an original work of authorship recognized under *Burrow-Giles Lithographic Co. v. Sarony*. The second input for style is the selection of the Starry Night and creative decisions for the amount and manner of transfer therefrom. *See Home Legend, LLC v. Mannington Mills, Inc.*, 784 F.3d 1404, 1411-12 (11th Cir.

112693363.6



September 27, 2022
Page 5

2015) (holding that defendants' selection and creative coordination of images to create final flooring design met minimal level of creativity as the designers exercised artistic judgment). There was no procedure or instruction in the human author's selection of the style input; he exercised his original intellectual concept to select which style to apply and coordinate how much to apply. Accordingly, "the subject artwork has been created by a human being where the work is basically one of human authorship and the computer (RAVHAV AI) is an assisting instrument," and the Work is protectable under the Copyright Act. March 1, 2022 letter. *See Urantia Foundation v. Maaherra*, 114 F.3d 955 (9th Cir. 1997) (noting "a work is copyrightable if copyrightability is claimed by the first human beings who compiled, selected, coordinated, and arranged" the underlying work); *Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 2000) ("[A]n author 'superintend[s]' the work by exercising control.") (internal citations omitted); *Mannion v. Coors Brewing Co.*, 377 F. Supp. 2d 444, 452 (S.D.N.Y. 2005) (holding "rendition" such as "effects achieved by means of filters" and "developing techniques" is copyrightable). Because the human author used the AI as tool for to implement his creative input, not the other way around, we respectfully request that the registration be granted.

Indeed RAGHAV is not a fully active and autonomous AI that can create artwork based solely on a verbal or written input, such as the Portrait of Edward Belamy. *See Generating Art from Neural Networks*, Tejash Kinariwala, WORLDQUANT (Dec. 16, 2019), available at: https://www.worldquant.com/ideas/generating-art-from-neural-networks/. It is not capable of creating anything on its own. Rather, RAGHAV is only capable of being *applied* to an existing work by a human, requiring to two human inputs. In this sense, it is no different than any other assistive tool, such as a camera, digital tablet, a photo-editing software program, or traditional non-AI powered filtering affects, but it just happens to be powered by machine learning. *See SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F.Supp.2d 301, 311 (S.D.N.Y. 2000) (holding that plaintiff's photographs met the minimal originality requirements because of the "totality of the precise lighting selection, angle of the camera, lens and *filter selection*." (emphasis added)).

IV.    Request for Disclosure or Acknowledgement

As set forth initially in this Request for First Reconsideration, Sahni is requesting to be listed as the sole author of the Work. Sahni originally included RAGHAV as a co-author out of a sense of legal obligation to provide comprehensive and accurate information to the Copyright Office regarding the creative process of the Work. It is for the same reason that Sahni respectfully requests that the work be granted registration with Sahni as the sole author but with some acknowledgement or attribution in the copyright record and registration that discloses that the work was created with an AI-powered assistive tool. This option (or requirement) is necessary for the U.S. Copyright Office to maintain the integrity of the registration process and of the registry. Without prompting, requiring, or at a minimum permitting applicants to disclose the use of an AI or machine learning powered tool and the extent of such use, applicants may seek to register works generated entirely or predominantly by an such AI or machine learning powered tool as their own. Thus the Examining Attorney would have no way of knowing



September 27, 2022
Page 6

whether or to what degree the work was created by a human versus the AI.  In contrast, allowing some notation regarding use of an AI assistive tool will promote creativity and progress of arts by resolving any uncertainty about the copyrightability of AI assisted art and discourage registration of wholly AI created works.

V.      Conclusion

For the reasons stated above, the Work satisfies the human authorship requirement as the human author used the AI-powered RAGHAV as an assistive tool, to apply a selected style filter to the author's original photograph. However, for the sake of the integrity of the copyright registry, Sahni requests that the copyright record and registration disclose that the work was created with an AI-powered assistive tool, specifically with regard to the applied filter/"style."

Best regards,

Alex P. Garens

APG/

112693363.6

# EXHIBIT 5



**United States Copyright Office**

Library of Congress · 101 Independence Avenue SE · Washington DC 20559-6000 · www.copyright.gov

April 10, 2023

Alex P. Garens
C/O Day Pitney, LLP
One Federal Street, 29th Floor
Boston, MA 02110

Correspondence ID:   1-5PR2XKJ
RE:     SURYAST

Dear Mr. Garens:

This correspondence is in response to your letter dated September 28, 2022 requesting reconsideration of the Copyright Office's refusal to register the work titled *Suryast*. You made this request on behalf of the applicant, Ankit Sahni.

We reviewed this work in light of the points raised in your letter. For the reasons stated below, we must uphold the refusal to register, because the work deposited is a derivative work that does not contain enough original human authorship to support a registration.

## Background

Ankit Sahni submitted an application on December 1, 2021 to register a work titled *Suryast*.[1] The application named Mr. Sahni as the author of "photograph" and "2-dimensional artwork," and it named RAGHAV Artificial Intelligence Painting App as a co-author of "2-dimensional artwork."[2] The application stated that the work was completed in 2020 and first published on November 2, 2020 in India. The Office does not question the date of creation or publication. In addition, the applicant also included the following note:

> The underlying visual artistic work titled 'SURYAST' has been generated with the assistance of an artificial intelligence application called 'RAGHAV Artificial Intelligence Painting App' which has been identified as a co-author in the present application along with the other human co-author Ankit Sahni. The underlying visual artistic work has received copyright registration from the Registrar of Copyrights, India. The Indian copyright registration bears the number A-135120/2020.[3]

---

[1] The Office notes that "suryast" is the Hindi word for sunset.

[2] As an initial matter, your letter asks the Office to amend the application to remove RAGHAV Artificial Intelligence Painting App as a co-author of the 2-dimensional artwork. Even if we granted this request, it would not alter our conclusion that this work does not contain a sufficient amount of human authorship to warrant copyright protection.

[3] The Office expresses no opinion regarding the registration of this work with the Registrar of Copyrights in India. The fact that the work may have been registered in another country is irrelevant to the Office's determination as to whether it is eligible for registration under U.S. law.

Alex P. Garens                              - 2 -                                    1-5PR2XKJ

The applicant uploaded a .pdf copy of the work, which is shown below.



After examining the application and deposit, the examiner emailed the applicant on February 28, 2022 to determine the extent of the human authorship involved in the creation of this work, if any. On April 14, 2022, the applicant provided a seventeen (17) page .pdf document in response.

Mr. Sahni explained that the work was produced with a tool known as the RAGHAV Artificial Intelligence Painting App. He explained that the app accepts "two inputs from the user," namely a "content input" and a "style input." "For the content input," Mr. Sahni said he "used an original photograph clicked by me using my phone's camera" (Response at p. 10). "For the style input," Mr. Sahni said he "selected Vincent van Gogh's *The Starry Night*." (*Id.*)

Upon review of the provided documentation, the examiner refused registration in a letter dated June 29, 2022 concluding that the work "lacks the human authorship necessary to support a copyright claim," and that any human involvement described by the applicant could not "be distinguished or separated from the final work produced by the computer program." The applicant's timely appeal followed.

In your letter, you confirmed that "the Work was created by the human author Sahni with the partial assistance of the AI-powered assistive tool RAGHAV . . . ." (Letter at 1). You explained that "Sahni took an original photograph and then selected and applied a computer-software 'filter' to that original photograph, changing the visual 'style' of his photograph to create a 2-D artwork." Your letter includes a side-by-side comparison of "the original photograph (left) and the final Work (right)."

Alex P. Garens                           - 3 -                           1-5PR2XKJ

 

Your letter goes on to describe the steps that were taken to create the two-dimensional artwork shown on the right.

> Sahni selected and uploaded the original photograph into the RAGHAV tool and then he selected various inputs, parameters, and controls to apply to the original photograph. Sahni selected the input style "Van Gogh" (a broad brush-stroke painting style) to filter his original photograph through. Sahni also selected the "strength" of the filter, meaning, how heavily the assistive tool would apply the filter to the original photograph.

(Letter at 2.)

**Discussion**

As you acknowledge in your letter, the work submitted for registration is "an original photograph that has been digitally altered by assistive software tools." (Letter at 2). A photograph that's been digitally altered or a drawing that's based on a photograph are classic examples of derivative authorship. *See Compendium* § 507.1 (listing "a sculpture based on a drawing;" "a drawing based on a photograph;" and "a lithograph based on a painting" as common examples of derivative works). The statute defines a derivative work as "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101. In this case, the preexisting work is the "original photograph" that Mr. Sahni created with his phone's camera, and the "final Work" that was submitted for registration is a derivative work that recast, transformed, or adapted that preexisting photograph (Letter at 2).

The Office will register a derivative work if the new authorship that the author contributed to the work contains a sufficient amount of original expression. Specifically, the derivative work must be independently created and the derivative authorship must possess more than a modicum of creativity. *See Waldman Publishing Corp. v. Landoll, Inc*., 43 F.3d 775, 782 (2d Cir. 1994); *see also Compendium (Third)* §§ 311.2, 507.1. The amount of creativity required for a derivative work is the same as that required for a copyright in any other work. "All that is needed to satisfy both the Constitution and the statute is that the 'author' contributed something more than a 'merely trivial' variation, something recognizably 'his own.'" *Alfred Bell & Co. v. Catalda Fine Arts, Inc*., 191 F.2d 99, 102-03 (2d Cir. 1951).

Courts interpreting the authorship requirement have consistently held that copyright protection is only available for works created by human beings. In the *Trade-Mark Cases*, the Supreme Court found that copyright only protects "the fruits of intellectual labor" that "are founded in the creative powers of the [human] mind." *Trade-Mark Cases*, 100 U.S. 82, 94 (1879). And in *Burrow-Giles Lithographic Co. v. Sarony*, the Court held that copyright is "the exclusive right of a man to the production of his own genius or intellect." 111 U.S. 53, 58 (1884). The defendant in that case argued that photographs could not be protected by copyright, because at the time the statute protected certain types of works created by an "author or authors." The defendant claimed that the plaintiff's photograph of Oscar Wilde did not satisfy this requirement, because it was simply "a reproduction on paper of the exact features of some natural object or of some person." *Id*. at 56. The Court rejected that argument, defining an author as "he to whom anything owes its origin; originator; maker; one who completes a work of science or literature." *Id*. at 58. Throughout its opinion, the Court consistently referred to "authors" as human beings and concluded that photographs may be eligible for copyright protection in "so far as they are representatives of original intellectual conceptions of the author." *See id*. at 58, 60-61(citing a British decision where the justices describe the "author" as the "person . . . who has actually formed the picture by putting the persons in position, and arranging the place where the people are to be" and "the man who really represents, creates, or gives effect to the idea" expressed in the work).

The Office strictly follows Supreme Court precedent, and adheres to the rule that human authorship is an essential element of copyright protection.[4] The *Compendium of U.S. Copyright Office Practices* explains that the Office "will register an original work of authorship, provided that the work was created by a human being," and the Office "will refuse to register a claim if it determines that a human being did not create the work." *Compendium of U.S. Copyright Office Practices* (Third) § 306. The *Compendium* provides several examples of works that do not satisfy this requirement.[5] In particular, the Office will

---

[4] Your letter acknowledges the human authorship requirement and you state that the applicant is "not challenging whether a work created entirely by a non-human being is eligible for copyright protection." (Letter at 1.) The letter then goes on to say that "[t]he Office has recognized numerous humans and non-humans to be 'authors for the purpose of [Title 17 of the U.S. Code]" (Letter at 3.) However, you provided no examples or citations to support this contention. To the extent you are referring to works created pursuant to a work made for hire relationship, the Office has made it clear that this principle does not provide a basis for extending the terms "author" and "authorship" to works produced by artificial intelligence. *See A Recent Entrance to Paradise*, US Copyright Office Review Board Letter to Ryan Abbot, Esq, February 14, 2022, available at: https://copyright.gov/rulings-filings/review-board/docs/a-recent-entrance-to-paradise.pdf.

[5] *See Compendium* §§ 709.1 (automated computer translations); 803.6(B) (derivative sound recordings made by purely mechanical processes); 808.8(E) (human selection required to register a colorized motion picture); 906.8 (machine-made visual arts works, such as linoleum flooring); 909.3(B) (x-rays and other medical imaging); 1006.1(A) (hypertext markup language created by a human being "rather than a website design program").

not register works "produced by a machine or mere mechanical process" that operates "without any creative input or intervention from a human author." *Id.* § 313.2.

Your letter describes the RAGHAV app as an "AI-powered assistive tool" or photo editing program "that just happens to be powered by machine learning." (Letter at 5.) Based on the information provided in your letter and Mr. Sahni's response to the examiner, it appears that Mr. Sahni input his preexisting photograph into the RAGHAV app, selected one of the available styles and settings provided by the app, and applied that style setting to the photo. (*See* Response at 9-12; Letter at 1-2.)

The process described does not exhibit the requisite human creativity needed to support a claim to copyright in a derivative work. Your letter concedes that "[t]here was no procedure or instruction in the human author's selection of the style input." (Letter at 5.) Nor is there anything to suggest that Mr. Sahni made any modifications or adjustments to the output that was generated by the app. Accordingly, we find that the RAGHAV app, and not Mr. Sahni—or any other human author—was responsible for generating the 2-dimensional image submitted for registration. Because this derivative authorship is not the result of human creativity or authorship, we must uphold the examiner's decision to refuse registration.[6]

Citing *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F. Supp. 2d 301, 311 (S.D.N.Y. 2000), you contend that Mr. Sahni's use of the RAGHAV app is "no different" than an author who modifies a preexisting image using an "assistive tool, such as a camera, digital tablet, a photo-editing software program, or traditional non-AI powered filtering affects." (Letter at 5.) As an initial matter, *SHL Imaging* is distinguishable, because the product photos at issue in that case were not derivative works. The court explained that "a derivative work must be based on a 'preexisting work," and "any derivative work must recast, transform or adopt the authorship contained in the preexisting work." 117 F. Supp. 2d at 306. The plaintiff's photos did not satisfy this requirement, because they merely depicted the products shown in each photo without recasting, transforming, or adopting the sculptural authorship that was embodied in those objects. *Id*. Nor is there anything in the opinion to suggest that the photographer took these photos and then modified the images through the use of photo-editing software.

The Office agrees that the use of a filter may be one of many decisions involved in creating an original photograph. However, *SHL Imaging* does not stand for the proposition that a photographer's use of a filter *alone* constitutes original authorship or derivative authorship. On the contrary, the court recognized that a photographer may satisfy the originality requirement based on the "*totality* of the precise lighting selection, angle of the camera, lens and filter selection." *Id*. at 311 (quoting *Rockford Map Publishers, Inc. v. Directory Services Co*., 768 F.2d 145, 148 (7th Cir. 1985)) (emphasis added). And as another court explained, "what made the photographs original [in *SHL Imaging*] was not the lens and filter selection themselves," but rather "[i]t was the *effect* produced by the lens and filters selected, among other things." *Mannion v. Coors Brewing,* 377 F. Supp. 2d 444, 452 (S.D.N.Y. 2005) (emphasis in original).

---

[6] Your letter describes several hypothetical scenarios where a human author could create a work and then expose it to an animate or inanimate object – such as a duck, a tree, or a thunderstorm – that could modify the work in some respect. (Letter at 4.) The Office expresses no opinion on these theoretical examples. Our determination in this case is based on the specific facts concerning Mr. Sahni's use of the RAGHAV app that were provided in your letter and in your client's initial response to the examiner.

Alex P. Garens                                    - 6 -                                    1-5PR2XKJ

Finally, you argue that the derivative artwork generated by the RAGHAV app is copyrightable, because it includes creative elements from Mr. Sahni's preexisting photograph, including its "structure, angle, and lighting." (Letter at 2.) The Office disagrees.

By their very nature, derivative works contain two distinct forms of authorship: (i) "The authorship in the preexisting work(s) that has been recast, transformed, or adapted within the derivative work," and (ii) "[t]he new authorship involved in recasting, transforming, or adapting the preexisting work(s)." *Compendium* § 507.1. However, the statute expressly states that the copyright in a derivative work "extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work." 17 U.S.C. §103(b). "[T]he material contributed by the author such work" plainly refers to the new authorship that the derivative author contributed to the new work. *Id*. Thus, when an applicant seeks to register a derivative work, the Office focuses on the new authorship that the derivative author contributed to that work – rather than the authorship from the preexisting work that may have been incorporated into the derivative work. *See id.; see also Compendium* § 311.2.

The Office recognizes that the application asserted a claim in "2-dimensional artwork" and "photograph." As mentioned above, your request for reconsideration includes a copy of the preexisting photograph that was used to create the derivative work shown in the deposit. The Office cannot consider this photo or the claim in "photograph" as part of this appeal, because the preexisting photograph shown in your letter is a separate work that was not submitted with the application for this derivative work. If Mr. Sahni wishes to register the preexisting photograph, he may submit a new application for that work, along with a copy of the photo and the appropriate registration fee.

**Conclusion**

For the foregoing reasons, the Office affirms the examiner's determination that the 2-dimensional artwork contained within the deposit cannot be registered because it is not the product of human authorship.

This letter is for your information only; no response is necessary.

Sincerely,

Aaron Watson
Attorney-Advisor for Registration Policy & Practice
U.S. Copyright Office

Enclosures:
  Reply Sheet



**United States Copyright Office**

Library of Congress · 101 Independence Avenue SE · Washington DC 20559-6000 · www.copyright.gov

\*1-5PR2XKJ\*

# Use this sheet <u>if</u> you request reconsideration

## How to request reconsideration:

- Send your written explanation *of why the claim should be registered or why it was* improperly refused.
- Be sure to include the Correspondence ID Number (listed under the bar code above) on the first page of your Request.
- Indicate whether you are requesting a "First Reconsideration" or "Second Reconsideration."
- **Submit your request ONLINE:** We strongly recommend sending all requests for reconsideration via email following these steps:

  **EMAIL YOUR REQUEST (BUT NOT THE REQUIRED FEE) to:**
  reconsideration@copyright.gov.
  o   The subject line should say "First Reconsideration" or "Second Reconsideration"
  o   Once your email request is received, you will be contacted with instructions on how to submit the required fee.
  o   Failure to send your request for reconsideration to the above email address will result in a delayed response.

  **IMPORTANT NOTE**: Your request and the required fee must be received no later than three months after a refusal is issued.

- **Alternatively, you may submit your request VIA MAIL**:

  o   **IMPORTANT NOTE**: Your request must be postmarked (via the U.S. Postal Service) or dispatched (via commercial carrier, courier, or messenger) no later than three months after a refusal is issued.
  o   Enclose the required fee.
  o   Address your request to:

    **FIRST RECONSIDERATION *or* SECOND RECONSIDERATION**
    **U.S. Copyright Office**
    **MCA Division**
    **P.O. Box 71380**
    **Washington, DC 20024-1380**

Alex P. Garens                                    - 8 -                                    1-5PR2XKJ

**First Request for Reconsideration ($350.00 per application):** The Registration Program Office considers the first request. If it upholds the refusal, you may submit a second request.

**Second Request for Reconsideration ($700.00 per application):** The Copyright Office Review Board considers the second request. The Board consists of the Register of Copyrights and the General Counsel (or their respective designees), and a third member appointed by the Register. The Board's decision constitutes final agency action.

**Notification of decision**: The Copyright Office will send all notifications of its decisions by email to the email address provided in the record and/or in the request for reconsideration. If no email address is provided, the Office will send its decision via mail.

**RECONSIDERATION FEES:**

**First Request**          $350 per application

**Second Request**        $700 per application


READ MORE:

- U.S. Copyright Office Administrative Appeals:
  https://copyright.gov/comp3/chap1700/ch1700-administrative-appeals.pdf

- U.S. Copyright Office Fees:
  https://copyright.gov/circs/circ04.pdf

- Copyright Basics:
  https://copyright.gov/circs/circ01.pdf

- Copyright Registration:
  https://copyright.gov/circs/circ02.pdf

# EXHIBIT 6



## DAY PITNEY LLP

BOSTON   CONNECTICUT   FLORIDA   NEW JERSEY   NEW YORK   PROVIDENCE   WASHINGTON, DC

**ALEX P. GARENS**

**SEAN PARK**

One Federal Street, 29th Floor
Boston, MA 02110
T: (617) 345-4872 F: (339) 600-9982
agarens@daypitney.com

July 10, 2023

**Via Email to (reconsideration@copyright.gov)**

United States Copyright Office
MCA Division
P.O. Box 71380
Washington DC 20024-1380

CORRESPONDENCE ID: 1-5PR2XKJ

**RE: SURYAST – Second Request for Reconsideration**

Dear Members of the Copyright Office Review Board:

We submit this Second Request for Reconsideration in response to the April 10, 2023 correspondence from Attorney-Advisor for Registration Policy and Practice, Aaron Watson ("Correspondence," Correspondence ID Number 1-5PR2XKJ) and in further support of the copyright registration of the work titled Suryast (the "Work"). In the First Request for Reconsideration dated September 28, 2022 ("Letter," Correspondence ID Number 1-59RZRGS), we stated that the Work is eligible for copyright protection, as it is the result of the creative and artistic choices and expressions of a human author with some contribution from the AI program. Attorney-Advisor Watson responded in the Correspondence that the Work is a derivative work that does not contain enough original human authorship to support a registration and upheld the refusal to register. We respectfully but firmly disagree with the characterization that the Work is a derivative work and reiterate that it contains sufficient amount of traditional elements of human authorship, not only in the original photograph but also in the final Work. For these reasons, discussed in detail below, we request again the Office reconsider its refusal to register the Work.[1]

---

[1] We request again to amend the application to remove RAGHAV AI as a co-author. This request was made to comply with the Office's Guidance, issued after the submission of the original application to register the Work.

115203053.6

**DAY PITNEY** LLP

United States Copyright Office, MCA Division
July 10, 2023
Page 2

### 1. Background

As discussed in prior submissions to the Office, the Work was created by the human author Ankit Sahni with partial assistance from the AI-powered tool RAGHAV (the "RAGHAV tool").  The human author took an original photograph for purposes of creating a piece of work using RAGHAV and then selected and applied a computer-software "filter" to that original photograph, changing the visual "style" to create a 2-D artwork. Below are the original photograph (left) and the final Work (right).

 

In greater detail, the human author uploaded the original photograph, created as an input for the creation of the end product final Work, into the RAGHAV tool and then selected various inputs, parameters, settings, and other controls to apply to the original photograph. For example, he selected the style input "Van Gogh" (a broad brush-stroke painting style) to filter his original photograph through. The human author also selected the "strength" of the filter, meaning, how heavily the assistive tool would apply the filter to the original photograph. The resulting Work is therefore, at its core, an original photograph that has been digitally transformed by the human author with the use of assistive software tools. The choice for the particular style input and the strength of the filter was entirely of the human author, from nearly infinite permutations and possibilities of specific inputs, and the RAGHAV tool merely functioned as an assistive tool that applied the human's deliberate and careful prompt in a manner similar to "filter selection" of a

115203053.6

**DAY PITNEY** LLP

United States Copyright Office, MCA Division
July 10, 2023
Page 3

camera, digital tablet, or a photo-editing software program. The only difference is that the tool itself was powered by AI, rather than traditional computational methods.

While the Work displays the original photograph input material's structure, angle, and lighting that are all copyrightable subject matter, it also significantly differs from the original photograph in at least colors, shapes, and style. For example, the input material displays a red sunset with white clouds and straight lines of a gray building. In contrast, the Work shows an orange sunset with yellow clouds and wavy contour of a blue building. Most importantly, the Work is not a photograph, but a 2-D artwork styled similarly to the famous Starry Night painting. On the whole, these new colors, shapes, and style, all created by the human author with a specific prompt for the Van Gogh input and strength of the filter, combine to result in a unique Work that is not substantially similar to the original photograph. In light of such differences between the original input material and the final Work, neither the human author nor the Office characterized the Work as a derivative work in any communication or document prior to the Correspondence, including the application (Service Request Number 1-11016599571), the Office's initial refusal, and the undersigned's Letter requesting first reconsideration.

### 2. The Work Contains Traditional Elements of Authorship from the Human Author.

As previously described in the Letter, the Work contains both human-authored and AI-generated material. Recently, the Office recognized that such "work containing AI-generated material" with "sufficient human authorship" will "support a copyright claim."
 *See* Copyright Registration Guidance: Works Containing Material Generated by Artificial Intelligence (hereinafter "Guidance"), 80 Fed. Reg. 16190, 16192 (Mar. 16, 2023). The Office explained that authors have long used technological tools to create their works or to recast, transform, or adapt their expressive authorship and discussed as a positive example, a visual artist using Adobe Photoshop to edit an image. *Id*. at 16193. Indeed, such policy is consistent with copyright law, as described in *Burrow-Giles Lithographic Co. v. Sarony,* 111 U.S. 53, 61 (1884).

Yet when presented with an application to register precisely such a work, the Office has taken the opposite approach, applying an extremely demanding standard, under which virtually no AI-assisted work could be registrable.

Here, the human author Sahni provided the traditional elements of authorship for both the original photograph and the Work. As noted above, he provided the traditional elements of authorship in creating the input material (an image of a sunset), such as structure, angle, and lighting. Then, the human author provided additional traditional elements of authorship in the Work, as he directed the RAGHAV tool to make changes to the colors, shapes, and style in a particular manner. In other words, the human author exercised his creative control to make the Work: 1) feature a sunset, 2) feature clouds, 3) feature contours of a building; 4) frame the

115203053.6

DAY PITNEY LLP

United States Copyright Office, MCA Division
July 10, 2023
Page 4

composition such that the sky accounts for the upper two thirds of the work; and 5) appear in a precise and deliberate style of Van Gogh's Starry Night. Such addition of colors, shapes, and style are traditional elements of authorship that the Office has recognized as copyrightable. *See* U.S. Copyright Office, Compendium of U.S. Copyright Office Practices (3d ed. 2021) §§ 905 (listing contours of a drawing or design and brush strokes of a painting as examples of original authorship) and 906.3 (stating addition of new shades of red and blue to a photograph as sufficiently creative); *see also* Correspondence at 5 ("The Office agrees that the use of a filter may be one of many decisions involved in creating an original photograph.").

Accordingly, the human author here did more than providing a simple prompt for the AI or delegating all creative decision-making. Instead, the human author created specific existing material (original photograph) and particular directions (inputting a specific Van Gogh's Starry Night style, the amalgamation of many sub-setting inputs), which the AI merely followed, to arrive at the Work. Thus, what the human author did is axiomatically different from the Office's example about a hypothetical user instructing a text-generating technology to write a poem about copyright law in the style of William Shakespeare. *See* Guidance at 16192. We do not dispute such a work would not be copyrightable, as the user merely provides a simple command and fulfills none of the traditional elements of authorship. But we believe the hypothetical user would be entitled to some copyright protection for creative control, if he or she had written a poem about copyright law and directed an AI to modify it in the style of Oberon from A Midsummer Night's Dream. The latter example describes what the human author here did; he not only created the original photograph but also gave the particular directions for the RAGHAV tool to apply the style of Van Gogh's Starry Night. In response, the AI mechanically applied the colors, shapes, and style as directed, which is not any different from, for example, Adobe Photoshop applying red and blue shades to a photograph based on a user's command. Because the human user provided more than merely trivial level of traditional elements of authorship to the Work, including colors, shapes, and style, we request that the Office reverse its refusal to register the Work.

### 3. The Work Is Not a Derivative Work.

Because the Work contains traditional elements of authorship from the human author, we respectfully request the Office reverse its refusal to register for the above stated reasons. In addition, we write to separately address the Correspondence's characterization that the Work is a derivative work. Correspondence at 3. The Copyright Act defines a "derivate work" as a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. 17 U.S.C. § 101. The statutory provision additionally states a work consisting of editorial revisions, annotations, elaborations, or other modifications that, as a whole, represent an original work of authorship, is a "derivative work." *Id.*

115203053.6

 DAY PITNEY LLP

United States Copyright Office, MCA Division
July 10, 2023
Page 5

However, not all works that are recast, transformed, or adapted from another work are derivative works.  Indeed, courts require that a younger work be substantially similar to the original work to be considered a derivative.  *Dam Things from Denmark v. Russ Berrie & Co., Inc.*, 290 F.3d 548, 565 (3d Cir. 2002) (quoting 1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 3.01); *Warner Brothers Entertainment Inc. v. RDR Books*, 575 F. Supp. 2d 513, 538 (S.D.N.Y. 2008) ("A work is not derivative, however, simply because it is 'based upon' the preexisting works.").  In cases where the younger work represents a substantial transformation of the preexisting work, it cannot be considered derivative.  *See, e.g., Castle Rock Entertainment, Inc. v. Carol Publishing Group., Inc.*, 150 F.3d 132, 143 n.9 (2d Cir. 1998) ("If a work sufficiently transforms the expression of the original work such that the two works cease to be substantially similar, then the work is not a 'derivative work.'").

Here, a side-by-side comparison of the Work to the original photograph demonstrates that it is not substantially similar to and therefore not a derivative of the original photograph.  As noted above, the Work contains significantly different colors, shapes, and style from the original photograph in the form of a 2-D artwork.  While the Work retains some elements from the original photograph, it differs in the overall look and feel from the original photograph so that an ordinary observer would not conclude the two works are substantially similar with same aesthetic appeal.  *See Abdin v. CBS Broad. Inc.*, 971 F.3d 57, 66 (2d Cir. 2020); Tanksley v. Daniels, 902 F.3d 165, 174 (3d Cir. 2018) ("In performing the ordinary observer test, "the trier of fact performs a side-by-side comparison of the works and, excluding any unprotectable elements, assesses whether the two works are substantially similar.").  For this reason, we respectfully request that the Office not frame the Work as a derivative work nor minimize the human author's contributions to the original photograph that remain in the Work.

The original photograph was not a preexisting work from which the Work is derived, but an early stage of what would ultimately become the Work.[2]  Indeed, the human author intentionally took the original photograph as part of his process for creating the Work, instead of being a standalone work.  The process was akin to a painter making a sketch before completing a painting, or a sculptor assembling clay before finalizing the form.  So the Work here additionally differs from most other derivative works, in that the human author is responsible for creating both the original photograph and the Work in a unitary process.  The human author's total creative input in both the original photograph and the Work should be considered together, and the Work should be analyzed for all the traditional elements of authorship present therein.  A contrary approach would result in dividing AI assisted works into each addition or change based on the preexisting work from just the moment before and trivializing each original contribution

---

[2] The human author listed in the application both "photograph" and "2-D artwork" as his creation, precisely because he intended to combine the elements of the original photograph and the Van Gogh style with the assistance of the RAGHAV tool to create the Work.

 **DAY PITNEY** LLP

United States Copyright Office, MCA Division
July 10, 2023
Page 6

to de minimis level.  This would render such works unregisterable, an outcome that is inconsistent with the copyright law and the Office's statements in the Guidance.

### 4.  Conclusion

For the reasons above, we respectfully request that the Office reverse its refusal to register the Work.  The human author engaged in a creative process to select the structure, angle, and lighting in the original photograph and the colors, shapes, and style of the Work, which in total resulted in a new and original, but not derivative, work.  He thus did more than simply "select[ing] one of the available styles and settings provided by the app, and appl[ying] that style setting to the photo."  Correspondence at 5.  The traditional elements of authorship were assisted by the RAVHAV tool, but, without question, originated from the human author.

Applying the Correspondence's reductive approach would have far-reaching implications to discourage and disincentivize creativity.  For example, all photographs with filters or effects from Adobe Photoshop may be considered derivative under such framework, and the photographers' contributions to the final images would be trivialized as merely selecting one of available styles.  Similarly, separating the creative process into a preexisting work (created by a human) and a final work (created with the assistance of AI) will categorically place the latter outside the scope of copyright protection, lacking sufficient human authorship in the final stage of applying the assistive AI.  Such framing will almost always disregard the underlying human creativity and involvement at the input stage, subjecting almost all AI assisted work to not receive copyright protection, inconsistent with the Guidance.

Truly yours,

Alex P. Garens

115203053.6

# EXHIBIT 7



**Copyright Review Board**
United States Copyright Office · 101 Independence Avenue SE · Washington, DC 20559-6000

December 11, 2023

Alex P. Garens, Esq.
Day Pitney, LLP
One Federal Street, 29th Floor
Boston, MA 02110

Re:   Second Request for Reconsideration for Refusal to Register SURYAST
      (SR # 1-11016599571; Correspondence ID: 1-5PR2XKJ)

Dear Mr. Garens:

The Review Board of the United States Copyright Office ("Board") has considered Ankit Sahni's ("Mr. Sahni") second request for reconsideration of the Office's refusal to register a two-dimensional artwork claim in the work titled "SURYAST" ("Work"). After reviewing the application, deposit copy, and relevant correspondence, along with the arguments in the second request for reconsideration, the Board affirms the Registration Program's denial of registration.

## I.   DESCRIPTION OF THE WORK

The Work is a two-dimensional artwork and is reproduced below:



Alex P. Garens, Esq.                                                     December 11, 2023
Day Pitney, LLP

## II.    ADMINISTRATIVE RECORD

On December 1, 2021, Mr. Sahni filed an application to register a claim in the Work.  In the application, he listed two authors: himself as the author of "photograph, 2-D artwork" and "RAGHAV Artificial Intelligence Painting App" ("RAGHAV") as the author of "2-D artwork."[1] Mr. Sahni was identified as the sole copyright claimant.  Because the application identified an artificial intelligence ("AI") "app" as an author of the work, the Copyright Office registration specialist assigned to the application requested additional information from Mr. Sahni about his use of the RAGHAV painting app in the creation of the Work.  Email from U.S. Copyright Office to Ankit Sahni (Feb. 28, 2022).  In response, Mr. Sahni submitted a 17-page document describing how RAGHAV's technology functions and how he used the technology to create the Work.  Email from Ankit Sahni to U.S. Copyright Office, Attach. (Apr. 14, 2022) ("Sahni AI Description").  As explained in the Sahni AI Description, Mr. Sahni generated the Work by taking an original photograph that he authored, inputting that photograph into RAGHAV, then inputting a copy of Vincent van Gogh's *The Starry Night* into RAGHAV as the "style" input to be applied to the photograph, and choosing "a variable value determining the amount of style transfer." *Id.* at 10–11.  Mr. Sahni further explained that he named RAGHAV as a co-author because its "contribution is distinct, disparate and independent" from his contribution to the Work. *Id.* at 14.

After considering the deposit, the application, and the Sahni AI Description, the Office refused to register the Work because it "lack[ed] the human authorship necessary to support a copyright claim."  Initial Letter Refusing Registration from U.S. Copyright Office to Ankit Sahni at 1 (June 29, 2022).  Responding to Mr. Sahni's assertion that the Work included some human creative input, the Office explained that "this human authorship cannot be distinguished or separated from the final work produced by the computer program." *Id.*

On September 27, 2022, Mr. Sahni requested that the Office reconsider its initial refusal to register the Work, arguing that "the human authorship requirement does not and cannot mean a work must be created entirely by a human author."  Letter from Alex Garens to U.S. Copyright Office at 1 (Sept. 27, 2022) ("First Request") (arguing the Work was registrable because it was "the result of the creative and artistic choices and expressions of [a] human author").[2]  After reviewing the Work in light of the points raised in the First Request, the Office reevaluated the claim and concluded that the Work could not be registered "because the work deposited is a derivative work that does not contain enough original human authorship to support a registration."  Second Refusal at 1.  The Office found that the Work was a "classic example[] of derivative authorship" because it was a digital adaptation of a photograph. *See id.* at 3 (citing U.S. COPYRIGHT OFFICE, COMPENDIUM OF U.S. COPYRIGHT OFFICE PRACTICES § 507.1 (3d ed. 2021) ("COMPENDIUM (THIRD)"); *see also* COMPENDIUM (THIRD) § 909.3(A) ("us[e of] digital editing software to produce a derivative photograph").  The Office analyzes derivative works by

---

[1] The application listed RAGHAV's authorship as a work made for hire and RAGHAV's "year born" as 2020.
[2] In the First Request, Mr. Sahni requested to amend the application to list only Ankit Sahni as the author of "photograph, 2-D artwork," and to remove RAGHAV as the work made for hire author of "2-D artwork."  First Request at 1.  However, as the Office's refusal of the First Request noted, even if it had granted this request, doing so "would not alter [the] conclusion that [the Work] does not contain a sufficient amount of human authorship to warrant copyright protection."  Refusal of First Request for Reconsideration from U.S. Copyright Office to Alex Garens at 1 n.2 (Apr. 10, 2023) ("Second Refusal").

-2-

Alex P. Garens, Esq.                                    December 11, 2023
Day Pitney, LLP

examining whether "the new authorship that the author contributed" meets the statutory requirements for protection.  Second Refusal at 4 (citing *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 782 (2d Cir. 1994); COMPENDIUM (THIRD) §§ 311.2, 507.1).  Because the new aspects of the Work were generated by "the RAGHAV app, and not Mr. Sahni—or any other human author," the Office found that the "derivative authorship [wa]s not the result of human creativity or authorship" and therefore not registrable.  *Id.* at 5.

In a letter dated July 10, 2023, Mr. Sahni requested that, pursuant to 37 C.F.R. § 202.5(c), the Office reconsider for a second time its refusal to register the Work.  Letter from Alex Garens to U.S. Copyright Office (July 10, 2023) ("Second Request").  The Second Request presented three arguments.  First, Mr. Sahni argued that RAGHAV served merely as an "assistive software tool[]," subject to creative decisions by Mr. Sahni in selecting his original photo, the *The Starry Night* image as the style input, and setting the variable value for the amount of style transfer.  *Id.* at 2.  Second, Mr. Sahni pointed to elements in the Work that he claims are human-authored.  *Id.* at 3.  According to Mr. Sahni, he "provided the traditional elements of authorship for both the original photograph and the Work" by taking the original photograph and "direct[ing] the RAGHAV tool to make changes to the colors, shapes, and style in a particular manner."  *Id.*  Mr. Sahni argues that his creation of the initial photograph and subsequent use of RAGHAV gave him control of the work and resulted in the Work containing elements such as a sunset and a building, depicted in a style of his choosing.  *Id.* at 3–4.  Third, Mr. Sahni argued that the Work is not a derivative work because the Work is not "substantially similar" to the original photograph.  *Id.* at 4–5.  Rather, the original photograph is "an early stage of what would ultimately become the Work."  *Id.* at 5.  Mr. Sahni contended that he "intentionally took the original photograph as part of his process for creating the Work . . . akin to a painter making a sketch before completing a painting, or a sculptor assembling clay before finalizing the form."  *Id.*  Therefore, the "human author's total creative input in both the original photograph and the Work should be considered together, and the Work should be analyzed for all the traditional elements of authorship present therein."  *Id.*

## III.   DISCUSSION

After carefully examining the Work and considering the arguments made in the First and Second Requests, the Board finds that the Work does not contain sufficient human authorship necessary to sustain a claim to copyright.

### A.   Legal Background

The Copyright Act protects, and the Office registers, "original works of authorship fixed in any tangible medium of expression."  17 U.S.C. § 102(a).  Courts have interpreted the statutory phrase "works of authorship" to require human creation of the work.  *See Thaler v. Perlmutter*, No. 22-cv-1564, 2023 WL 5333236, at *4 (D.D.C. Aug. 18, 2023) (stating that "human authorship is a bedrock requirement of copyright" in affirming the Office's refusal to register a work "autonomously" created by AI).  For this reason, courts have uniformly rejected attempts to protect the creations of non-humans through copyright.  For example, the Ninth Circuit held that a book containing words "'authored' by non-human spiritual beings" can only gain copyright protection if there is "human selection and arrangement of the revelations." *Urantia Found. v. Kristen Maaherra*, 114 F.3d 955, 957–59 (9th Cir. 1997) (holding that "some

Alex P. Garens, Esq.                                                    December 11, 2023
Day Pitney, LLP

element of human creativity must have occurred in order for the Book to be copyrightable" because "it is not creations of divine beings that the copyright laws were intended to protect"). Similarly, copyright does not protect photographs taken by a monkey because the Copyright Act's terms "imply humanity and necessarily exclude animals." *Naruto v. Slater*, 888 F.3d 418, 426 (9th Cir. 2018), *decided on other grounds*. Recently, in *Thaler v. Perlmutter*, the U.S. District Court for the District of Columbia explained:

> By its plain text, the 1976 Act . . . requires a copyrightable work to have an originator with the capacity for intellectual, creative, or artistic labor. Must that originator be a human being to claim copyright protection? The answer is "yes."

2023 WL 5333236, at *4 (footnote omitted). Because copyright protection is only available for the creations of human authors, "the Office will refuse to register a [copyright] claim if it determines that a human being did not create the work." COMPENDIUM (THIRD) § 306.

When analyzing AI-generated material, the Office must determine when a human user can be considered the "creator" of AI-generated output. In March 2023, the Office provided registration guidance to the public for works created by a generative-AI system. The guidance explained that, in considering an application for registration, the Office will ask:

> [W]hether the 'work' is basically one of human authorship, with the computer [or other device] merely being an assisting instrument, or whether the traditional elements of authorship in the work (literary, artistic, or musical expression or elements of selection, arrangement, etc.) were actually conceived and executed not by man but by a machine.

*Copyright Registration Guidance: Works Containing Material Generated by Artificial Intelligence*, 88 Fed. Reg. 16,190, 16,192 (Mar. 16, 2023) (quoting U.S. COPYRIGHT OFFICE, SIXTY-EIGHTH ANNUAL REPORT OF THE REGISTER OF COPYRIGHTS FOR THE FISCAL YEAR ENDING JUNE 30, 1965, 5 (1966)); *see also id.* (asking "whether the AI contributions are the result of 'mechanical reproduction' or instead of an author's 'own original mental conception, to which [the author] gave visible form.'") (quoting *Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 60 (1884)). This analysis is "necessarily . . . case-by-case" because it will "depend on the circumstances, particularly how the AI tool operates and how it was used to create the final work." *Id.*[3]

To enable the Office to conduct such an analysis, registration applications must disclose AI-generated content that is "more than *de minimis*." *Id.* at 16,193. Applicants may disclose and exclude such material by placing a brief description of the AI-generated content in the "Limitation of the Claim" section on the registration application. The description may be as brief and generic as "[description of content] generated by artificial intelligence." *Id.*

If all of a work's "traditional elements of authorship" are generated by AI, the work lacks human authorship, and the Office will not register it. *Id.* If, however, a work containing AI-

---

[3] This case-by-case analysis yields varying outcomes. In 2023 to date, the Copyright Office has granted approximately 100 applications to register works containing AI-generated material, where the AI-generated contributions are disclaimed.

-4-

Alex P. Garens, Esq.                                              December 11, 2023
Day Pitney, LLP

generated material also contains sufficient human authorship to support a claim to copyright, then the Office will register the human's contributions. *Id.* at 16,192–93.

When examining claims for derivative works, the Office focuses on whether "[t]he new authorship that the author contributed" meets the statutory requirements for protection. COMPENDIUM (THIRD) § 311.2. A derivative work is "a work based upon one or more preexisting works, such as … abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted, . . . which, as a whole, represent[s] an original work of authorship." 17 U.S.C. § 101 (defining "derivative work"). Accordingly, a derivative work contains "two distinct forms of authorship:" the authorship in the preexisting work that was recast, transformed, or adapted, and the new authorship as a result of recasting, transformation, or adaption. COMPENDIUM (THIRD) § 507.1. The Office's examination of derivative works focuses on the new authorship that the derivative author contributed to that work — rather than the authorship from the preexisting work that may have been incorporated into the derivative work, *see id.* § 311.2, because copyright "in a compilation or derivative work" is "independent of . . . any copyright protection in the preexisting material." 17 U.S.C. § 103(b).

### B. Application of Legal Standards to the Work

Under the Copyright Act, Mr. Sahni's original photograph is a separate work of authorship because it was fixed separately from the Work. *See id.* § 101 ("a work is 'created' when it is fixed in a copy or phonorecord for the first time"); COMPENDIUM (THIRD) § 512 (similar). Because the Work here contains AI-generated material, the Board starts with an analysis of the Work's creation, including Mr. Sahni's use of RAGHAV. According to Mr. Sahni, RAGHAV is an "AI-powered tool" that uses machine learning to perform "Neural Style Transfer," which entails "generat[ing] an image with the same 'content' as a base image, but with the 'style' of [a] chosen picture." Second Request at 2; Sahni AI Description at 4, 6.[4] According to Mr. Sahni, RAGHAV was created[5] by training a neural network for image recognition using a dataset of 14 million images, called ImageNet,[6] and then training the neural network on another dataset of "content and style images" so that it learns how to transfer styles from the latter to the former. Sahni AI Description at 7. Mr. Sahni informed the Office that the model operates by taking two image inputs—one image in the desired style (the "style image"),

---

[4] RAGHAV was built based on a method described in a Google Brain research paper titled "Exploring the structure of a real-time, arbitrary neural artistic stylization network." *See* Sahni AI Description at 6 (citing Golnaz Ghiasi et al., *Exploring the structure of a real-time, arbitrary neural artistic stylization network* (Aug. 2017), https://arxiv.org/abs/1705.06830). The Sahni AI Explanation includes a number of figures from the underlying research paper to illustrate the technology. *See generally id.*

[5] There is no evidence in the administrative record as to the details of how RAGHAV was created or by whom and whether Mr. Sahni was involved in that process. While Mr. Sahni has stated that RAGHAV was "built with a variant of Neural Style Transfer using [a] research paper" from Google, *id.* at 6, he does not claim to have developed RAGHAV. For this reason, the Board does not consider the development of RAGHAV or selection of the materials it was trained on as bases for Mr. Sahni's creative control over the Work. *Cf.* Defs.' Resp. to Pls.' Mot. for Summ. J. and Cross-Mot. for Summ. J. at 5 n.1, Thaler v. Perlmutter, No. 1:22-cv-1564 (D.D.C. Feb. 7, 2023), ECF No. 17 (explaining that the Office could not determine whether AI-generated work was sufficiently original to receive copyright protection because "among other potentially relevant facts, the Office does not know what preexisting works the Creativity Machine was trained on").

[6] ImageNet is a large collection of images commonly used for training AI systems. *See* Dave Gershgorn, *The data that transformed AI research—and possibly the world*, QUARTZ (July 26, 2017), https://qz.com/1034972/the-data-that-changed-the-direction-of-ai-research-and-possibly-the-world.

Alex P. Garens, Esq.                                                    December 11, 2023
Day Pitney, LLP

and a second image to which the style will be applied (the "base image"), as well as a numerical value indicating the amount or strength of style transfer. *See id.* at 10–12. RAGHAV then produces an output based on its interpretation of these three inputs. *Id.* at 8. In other words, according to Mr. Sahni, RAGHAV does not simply layer the style image on top of the base image like a visual filter applied to a photograph. RAGHAV instead generates a new image based on the features it learns from the base and style images. *Id.* at 6 (RAGHAV uses a technique that "allows us to *generate* an image with the same 'content' as a base image, but with the 'style' of our chosen picture") (emphasis added).[7]

Turning to creation of the Work here, Mr. Sahni states he provided RAGHAV with a base image (Mr. Sahni's original photograph), a style image (Vincent van Gogh's *The Starry Night*), and an undisclosed numerical value for the strength of the style transfer. *Id.* at 9–12. RAGHAV then generated the Work, and Mr. Sahni does not claim to have modified the Work after it was generated. Each of the image contributions are depicted below alongside the resulting output image:



**Mr. Sahni's Original
Photograph
(base image)**



**Vincent Van Gogh's *The Starry Night*
(style image)**

---

[7] The Second Request describes the RAGHAV tool as a "filter" tool, which contradicts Mr. Sahni's initial description. As discussed below, even if the Board accepted the Second Request's description of RAGHAV, the Board's conclusion would be the same because selecting the strength of a visual filter, by itself, is not sufficiently creative to be protected by copyright.

Alex P. Garens, Esq.                                          December 11, 2023
Day Pitney, LLP



**The Work
(output)**

Mr. Sahni argues that the decisions he made are sufficient to make him the "author" of the Work in its entirety.  The Second Request asserts that "conceiving, creating and selecting an original [base] image," "selection of the style image," and "selecting a specific variable value determining the amount and manner of style transfer" "cumulatively resulted in the [Work], which is the direct outcome of [Mr. Sahni's] creative expression and contribution."  Sahni AI Description at 11–12; *see also* Second Request at 4.  As evidence of his creative control, Mr. Sahni claims his decisions resulted in the Work containing 1) "a sunset," 2) "clouds," 3) the "contours of a building," 4) a composition in which "the sky accounts for the upper two thirds of the work," and 5) "a precise and deliberate style of Van Gogh's [The] Starry Night."  Second Request at 3–4.

After considering the information provided by Mr. Sahni regarding his creation of the Work, including his description of RAGHAV, the Board concludes that the Work is not the product of human authorship.  Specifically, the Board finds that the expressive elements of pictorial authorship were not provided by Mr. Sahni.  As Mr. Sahni admits, he provided three inputs to RAGHAV: a base image, a style image, and a "variable value determining the amount of style transfer."  Sahni AI Description at 11.  Because Mr. Sahni only provided these three inputs to RAHGAV, the RAGHAV app, not Mr. Sahni, was responsible for determining how to interpolate the base and style images in accordance with the style transfer value.  The fact that the Work contains sunset, clouds, and a building are the result of using an AI tool that "generate[s] an image with the same 'content' as a base image, but with the 'style' of [a] chosen picture."  *Id.* at 6.  But Mr. Sahni did not control where those elements would be placed, whether they would appear in the output, and what colors would be applied to them—RAGHAV did.[8]

---

[8] While not the basis for our conclusion, the Board notes that Mr. Sahni has stated elsewhere that "Raghav chooses and creates the brush strokes and colour palette."  Govind Kumar Chaturvedi, *A.I. Paintings: Registrable*

Alex P. Garens, Esq.                                                                December 11, 2023
Day Pitney, LLP

The Board is not convinced by Mr. Sahni's description of RAGHAV as "an assistive tool" that works similarly to "a camera, digital tablet, or a photo-editing software program." Second Request at 2–3. In his Second Request, Mr. Sahni now describes RAGHAV as merely "mechanically appl[ying] the colors, shapes, and style as directed, which is not any different from, for example, Adobe Photoshop applying red and blue shades to a photograph based on a user's command." *Id.* at 4. This description inaccurately minimizes RAGHAV's role in the creation of the Work and conflicts with other information in the record. As Mr. Sahni stated in his initial explanation, RAGHAV operates by "generat[ing]" a new pictorial image based on features learned from user-provided images. *See* Sahni AI Description at 8 (operation of RAGHAV causes "new stylizations [to] be generated"). The underlying research that RAGHAV was built on is premised on the same functionality: it is the AI model, not its user, that "predict[s] stylizations for paintings and textures never previously observed," and that predictive function is tied to "the proximity of the [style image] to styles trained on by the model." Golnaz Ghiasi et al., *supra* note 4 at 5, 9. Here, RAGHAV's interpretation of Mr. Sahni's photograph in the style of another painting is a function of how the model works and the images on which it was trained on—not specific contributions or instructions received from Mr. Sahni. While Mr. Sahni selected the numerical variable for the "strength" of the style, that choice alone is insufficient to warrant copyright protection. As noted above, selecting a single number for a style filter is the kind of *de minimis* authorship not protected by copyright. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 359 (1991) (copyright does not protect "works in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent"); *see also* COMPENDIUM (THIRD) § 909.3(A) (providing example of digital edits that "improve[] the color, tone, and temper" of a photograph and remove noise as ineligible for copyright protection).

Mr. Sahni's remaining arguments do not alter the Board's conclusion. While Mr. Sahni emphasizes his specific choices of image inputs and filter strength as one choice "from nearly infinite permutations and possibilities of specific inputs," these choices only constitute an unprotectable idea for the Work, that is: an altered version of his photograph in the style of *The Starry Night*. Second Request at 2. But copyright does not protect the concept reflected in a work—"protection is given only to the expression of the idea—not the idea itself." *Mazer v. Stein*, 347 U.S. 201, 217 (1954); *see also, e.g.*, *Herbert Rosenthal Jewelry Corp. v. Kalpakian*, 446 F.2d 738, 742 (9th Cir. 1971) (copyright in bee jewelry was not infringed by other bee jewelry because "[a] jeweled bee pin is … an 'idea' that defendants were free to copy"). Nor does the Board agree with Mr. Sahni that his original photograph was "not a preexisting work" and that its expressive elements that also appear in the Work are therefore a basis for registration. Mr. Sahni is welcome to apply to register his photograph, assuming it meets all statutory requirements, but he cannot register the AI-modified version before the Board.[9] Because Mr. Sahni exerted insufficient creative control over RAGHAV's creation of the Work, he cannot register it.

---

*Copyright? Lessons from Ankit Sahni*, IP OSGOODE (Mar. 31, 2023), https://www.iposgoode.ca/2023/03/a-i-paintings-registrable-copyright-lessons-from-ankit-sahni/.

[9] To register the original photograph, Mr. Sahni would need to submit the photograph as the deposit along with an application claiming that photographic authorship. *See* 17 U.S.C. § 408(b)(1), (2) (registration deposits must consist of at least one "complete copy"); 37 C.F.R. § 202.20(b)(2)(1), (2) (depending on a work's publication status, the "complete copy" must "represent[] the entire copyrightable content of the work" or "include[] all elements comprising the applicable unit of publication of the work").

Alex P. Garens, Esq.                                                December 11, 2023
Day Pitney, LLP

## IV.    CONCLUSION

For the reasons stated herein, the Review Board of the United States Copyright Office affirms the refusal to register the copyright claim in the Work.  Pursuant to 37 C.F.R. § 202.5(g), this decision constitutes final agency action.

**U.S. Copyright Office Review Board**
Suzanne V. Wilson, General Counsel and
    Associate Register of Copyrights
Maria Strong, Associate Register of Copyrights and
    Director of Policy and International Affairs
Mark T. Gray, Assistant General Counsel